Mrs. Shirley PRY *v.* Dr. John Walter JONES

5-6049                                        487 S.W. 2d 606

Opinion delivered December 4, 1972
[Rehearing denied January 8, 1973.]

*Alonzo D. Camp,* for appellant.

*Wright, Lindsey & Jennings,* for appellee.

J. Fred Jones, Justice. This is an appeal by Mrs. Shirley Pry from a judgment of the Miller County Circuit Court directing a jury verdict for the appellee-defendant, Dr. John Walter Jones, in a medical malpractice suit brought by Mrs. Pry.

The facts appear as follows: The appellant Mrs. Pry underwent surgery in a Texarkana hospital for the removal of a cyst from her right ovary. The condition was diagnosed and the surgery performed by Dr. Jones. In the course of the surgery the complete removal of the right ovary was found to be necessary and since Mrs. Pry's uterus had been removed in the previous surgery and her ovaries were no longer of use as reproductive organs, Dr. Jones concluded that the left ovary should be removed also. In the process of removing the left ovary, the left ureter was severed and Mrs. Pry filed suit against Dr. Jones in the Miller County Circuit Court alleging that he was guilty of medical negligence in several particulars, including failure to perform pre-operative studies; failure to demonstrate and isolate the left ureter and in severing the left ureter.

In his answer Dr. Jones admitted the surgical removal of both ovaries. He admitted that during the course of surgery the left ureter was "inadvertently damaged and promptly repaired." He denied the other allegations. When Mrs. Pry rested her case at the close of her evidence, Dr. Jones moved for a directed verdict and his motion was granted. On her appeal to this court Mrs. Pry relies on the following point for reversal:

> "The trial court was in error in granting defendant's motion for a directed verdict at the close of plaintiff's case."

Dr. Jones was called as a witness by Mrs. Pry and he testified that Mrs. Pry had a hysterectomy back in 1968 and at that time her uterus was removed. He testified that in the operation for the removal of the ovaries he found the left ureter bound in scar tissue from adhesions but otherwise, as far as he could tell, the left ureter was a

healthy organ carrying out its normal function in conveying urine from the kidney to the bladder. Dr. Jones then testified that in removing the left ovary the left ureter was completely severed including blood vessels, muscles and nerves. He testified that he immediately called in Dr. Gerald Teasley, a specialist in urology, and that Dr. Teasley repaired the damaged ureter by suturing it back together.

On cross-examination Dr. Jones testified in part as follows:

"Q.  Doctor Jones, would urinary incontinence be in any way involved with the ureter?

A.  It could be. The only way you would get urinary incontinence from the ureter is if the wound had never healed, and the urine drains out on the abdomen or the vagina, or some place else. That wouldn't have anything to do with the function of the bladder in the exit of urine from the bladder.

Q.  And of course, if you had that type of drainage you would know it, wouldn't you?

A.  Yes, sir.

Q.  There would be no question about it?

A.  No, sir.

Q.  The urine would fill abdominal cavity, or—

A.  Or run out the skin, maybe.

Q.  Do you have any reason to believe that Mrs. Pry has that kind of difficulty?

A.  If she does, it is not related to that surgery."

Mrs. Pry testified that she was a licensed practical nurse and had worked as a nurse to the gynecologist and

obstetrician at Southern Clinic in Texarkana for a period of almost three years. She testified that when she awakened following her surgery, a nurse was changing dressings on her abdomen. She said that she recognized the dressing as a "heavy drainage dressing," and that it completely covered her abdomen. She testified that when the dressing was removed, she observed one drainage tube protruding from the lower end of the abdominal operative incision and another one protruding from her left side. She testified that the two tubes aroused her curiosity because she knew that a drainage tube was not placed into the left side following a normal oophorectomy. Mrs. Pry testified that urine seemed to be draining from the tube in her left side; that she suspected her ureter had been severed and that she confirmed her suspicion from the entries on her chart. She said that a considerable volume of urine flowed continuously from the tube in her left side and her skin around the drain became blistered because of the urine soaked bandages. She said it was necessary to have medication for the blistered skin.

Mrs. Pry testified that following her surgery a catheter was placed in her bladder for the purpose of draining the urine from the bladder, but that the catheter was removed on the fifth day following surgery. She said that on the tenth day following the surgery she was discharged from the hospital with the drain tube still in her left side and with urine still draining from it. She testified that after she had been home for about one and a half weeks, the urine contined to flow from the drain tube in about the same volume as when she was in the hospital and that when she developed a temperature, she returned to Dr. Teasley who readmitted her to the hospital. Mrs. Pry then testified as to the procedure followed by the doctor in attempting to insert a ureter catheter from her bladder to the kidney through the left ureter. She said the catheter was passed through the bladder and up into the ureter without difficulty but as it was inserted further up the ureter, instead of continuing inside the ureter to the kidney, it went through an opening in the wall of the ureter where it had

been severed and had not healed. She said she was in the hospital on this occasion for five days and that following the procedure carried out by Dr. Teasley in opening up the ureter, the drainage of urine through the tube in her side soon stopped.

Mrs. Pry's hospital discharge record signed by Dr. Jones reads in part as follows:

"At surgery, each ovary was densely bound to the side walls of the pelvis. The left ovary was lifted up and its pedicle clamped, cut and ligated. In the further operative procedure, the left ureter could not be demonstrated. It was apparent then that the left ureter lay in the middle of the left ovarian pedicle and was surrounded on all sides by the ovarian vessels. Doctor Teasley did an end to end anastromosis of the ureter with no splinting and no ureteral catheterization. A penrose drain was placed in her side. Postoperatively, her course was uneventful, save she drained considerable urine through the stab wound in the left side and was still draining at the time she was dismissed from the hospital."

The Report of Operation signed by Dr. Jones reads in part as follows:

"With much difficult sharp dissection, the left ovary is finally exposed. It is densely adherent to the side walls of the pelvis. It is lifted up, its pedicle is clamped, cut and ligated. Bleeding is controlled. At this time, we looked for the left ureter and cannot locate it. We see what appears to be the ureter in the clamped tissues of the ovarian pedicle. It is isolated as it is the lower end. Dr. Teasley comes in and then runs a catheter both ways up it, and verifies that the lower end goes into the bladder by putting some Dye into the bladder. Anastomoses the end of the catheter, and a Penrose drain is inserted, extraperitoneally on the left down to this area."

Expert testimony from third party medical witnesses is not essential or even necessary in every medical malpractice case. The necessity for the introduction of expert medical testimony in malpractice cases was exhaustively considered in *Lanier* v. *Trammell,* 207 Ark. 372, 180 S. W. 2d 818, and in that case we held that expert testimony is not required when the asserted negligence lies within the comprehension of a jury of laymen, such as a surgeon's failure to sterilize his instruments [as was the evidence in *Lanier*] or to remove a sponge from the incision before closing it. This rule was again reiterated in *Graham* v. *Sisco,* 248 Ark. 6, 449 S. W. 2d 949, in which case we reversed a summary judgment of the trial court in favor of the attending physician who had "cut so deeply" he injured an unborn child in delivering the child by ceasarean section. In the very recent case of *Davis* v. *Kemp,* 252 Ark. 925, 481 S.W. 2d 712, we affirmed the judgment of the trial court in directing a verdict for the defendant doctor in a malpractice case. In that case the negligence alleged was the doctor's failure to irrigate, x-ray and probe an ankle wound for broken glass upon the first visit to the doctor's office when it was later determined that some broken glass was concealed in the wound. As already stated, we affirmed the direction of a verdict in *Davis* v. *Kemp* under the facts of that case but in doing so, we said:

"The applicable rule is well settled in this State. *Graham* v. *Sisco,* 248 Ark. 6, 449 S. W. 2d 949 (1970):

'The necessity for the introduction of expert medical testimony in malpractice cases was exhaustively considered in *Lanier* v. *Trammell,* 207 Ark. 372, 180 S. W. 2d 818 (1944). There we held that expert testimony is not required when the asserted negligence lies within the comprehension of a jury of laymen, such as a surgeon's failure to sterilize his instruments or to remove a sponge from the incision before closing it. On the other hand, when the applicable standard of care is not a matter of common know-

ledge the jury must have the assistance of expert witnesses in coming to a conclusion upon the issue of negligence.'"

Returning now to the case at bar, Dr. Jones admitted in his answer and also from the witness stand that he "inadvertently" severed the left ureter in removing the left ovary. The evidence indicates no such medical urgency that might have required fast or unusual procedure or justified the inadvertent severing of the ureter in the surgical removal of the left ovary. There is no question that Dr. Jones was familiar with the normal location of the left ureter and the evidence is clear that he looked for and failed to find it at its usual and proper location. The evidence indicates, however, that he proceeded to remove the left ovary without first identifying the left ureter and only found the left ureter when he noticed the severed end of it in the severed pedicle of the ovary. Dr. Jones was bound to have known that the left ureter lay somewhere in the immediate area of surgical invasion and we are of the opinion the trial court erred in directing a verdict for Dr. Jones at the close of Mrs. Pry's case.

The appellee argues that the trial court correctly directed a verdict because the "appellant's evidence, lacking expert medical testimony, was insufficient as a matter of law to permit a jury inference that appellee's alleged acts or omission were a proximate cause of appellant's alleged damages." We find no merit in this argument. There is ample evidence that the "stab wound" in Mrs. Pry's left side was for the sole purpose of inserting a drainage to the severed ureter and that this was done. The evidence is clear that the second five day period of hospitalization was brought about because the severed ureter had not properly healed and the kidney was still continuing to drain urine through the stab wound in Mrs. Pry's left side rather than into her bladder, and that this situation continued until the ureter was "opened up" between the bladder and the wound in the ureter wall where it had been severed and surgically repaired.

The judgment of the trial court is reversed and this cause remanded for a new trial.

Reversed and remanded.

BROWN, J., not participating.

FOGLEMAN, J., dissents

JOHN A. FOGLEMAN, Justice. dissenting. The majority equates the evidence in this case with that in *Lanier* v. *Trammell*, 207 Ark. 372, 180 S.W. 2d 818. The distinction seems so clear to me that it should leave no room for argument. Of course, expert testimony was not required to show that failure of a surgeon to wash his hands or to sterilize his surgical instruments before an operation or to remove a sponge from the surgical incision constituted negligence as these are matters of common knowledge. If the matters set out in the majority opinion are of common knowledge, however, I am astounded to learn of the extent of the acquaintance of the ordinary person with the human anatomy and its functions.

The distinction between cases as to the necessity for expert testimony was clearly pointed out in *Lanier*, where we said:

If there could, under the testimony, be any dispute as to the method used in the operation or in the treatment of the patient it would be necessary to establish the correct method by expert witnesses, but we do not have that situation here. There was no dispute whatever as to what was the proper course to be pursued by appellant in preparing for and performing the operation. It was not denied that it was necessary and proper for appellant to cleanse his hands thoroughly and to sterilize his instruments. The dispute in this case was as to whether or not appellant followed the course which is conceded to be necessary and proper. Appellant says that he did and appellee and one of his witnesses testified that he did not follow this course. No amount of

expert testimony could have thrown any light whatever on the real question in this case.

We also recognized in *Lanier* the efficacy of *Gray* v. *McDermott*, 188 Ark. 1, 64 S.W. 2d 94, saying:

> Our conclusion that we are not required to set aside the verdict of the jury in this case because of lack of medical or expert testimony to support it is not in conflict with anything said in our opinion in the case of Gray v. McDermott, 188 Ark. 1, 64 S.W. 2d 94, 96. In that case it was insisted by the complaining party that the surgeon in operating had failed to do certain things that he should have done. The surgeon and the expert witnesses testified in that case that the surgeon operated in an approved and skilful manner, and that it would not have been proper for the surgeon to have done the things, the omission of which was claimed to amount to negligence. It was held in that case that a jury should not be permitted to "speculate whether or not the experts in the practice of their profession have pursued the proper course of procedure." We have no such situation in the case at bar. The question here is not whether appellant in operating followed the approved and skilful method in doing so, but whether or not, prior to the operation, he sterilized his instruments and cleansed his hands. The jury found that he did not do so. No amount of expert or medical testimony as to the proper or improper method of operating would have thrown any light on this question, which was the sole question in litigation.

In *Gray* v. *McDermott*, the allegations of negligence were that the surgeon was negligent in failing to open up a wound to ascertain that an axillary vein was severed by a bullet and in failing, when the vein began to bleed profusely during subsequent surgery, to ligate both ends of the vein. The patient died and his widow instituted suit. She introduced no evidence on the first allegation of negligence. There we said:

The question as to whether or not it was proper or improper for the physicians in charge to open up the wound or probe into it on August 24 or some subsequent time thereto to determine whether or not a vein had been severed by the bullet; and also the question as to whether the physicians were negligent in failing to ligate both ends of the vein on September 3, when the operation was performed, were questions requiring scientific knowledge to determine. It cannot and should not be left to a jury to speculate whether or not the experts in the practice of their profession have pursued the proper course of procedure.

So far as I am able to ascertain, we have never departed from these principles.

I submit that every question involved here requires scientific knowledge to determine. The alleged negligence was in severing appellant's left ureter, and in failing to perform preoperative studies, to demonstrate the ureter, to take safety measures by isolation of the ureter and to associate a urologist in performing the operation. I can conceive of no argument that could be advanced that the question of preoperative studies and association of a urologist were not matters purely within the realm of medical expertise alone. It seems to me that the majority find evidence of negligence in a lack of urgency which would necessitate fast or unusual procedures for the removal of appellant's left ovary, and in the surgeon's proceeding to remove this ovary without first identifying the left ovary after his failure to find appellant's left ureter in its proper place, and in concluding that Dr. Jones was bound to know that the left ureter lay somewhere in the immediate area of surgical invasion.

The issue in the case was thus stated by appellant:

Was the defendant negligent in severing plaintiff's ureter while removing plaintiff's ovaries? We are not concerned with the standards the defendant observed in surgically removing the ovaries—in performing

an oophorectomy. Had plaintiff challenged defendant's professional actions in performing the oophorectomy it would have been necessary to establish plaintiff's theory by means of expert medical testimony. We are only concerned with defendant's act in cutting the ureter.

On the subject of the ureter, Dr. Jones' testimony may be summarized as follows:

Neither he nor a pathologist had examined the patient's ureter microscopically before the surgery. As far as he could tell it was a perfectly healthy organ, except for scarring he found on the outside, where it was adhered to the ovary. He found no abnormality other than its *abnormal* location.

This doctor's reports are reproduced in the majority opinion.

It seems to me that expert testimony was lacking at least in the following essential particulars:

1. The normal position of a normal healthy ureter.

2. The probability or improbability of its being in a normal position.

3. The probability of its being found in the middle of the left ovarian pedicle surrounded by the ovarian vessels.

4. The procedures available and used in the community to detect such an abnormal location of the ureter.

5. The effect of the fact the ovary was densely adherent to the side walls of the pelvis in preventing the detection of the location of the ureter before the ovary was removed.

6. The degree of skill and learning possessed and used by physicians engaged in his type of practice in the community and the procedures followed in these circumstances in the exercise of that skill and learning.

I confess that my knowledge of these pertinent facts may be more limited than "common knowledge," but I doubt that many judges or jurors are possessed of adequate knowledge to pass judgment upon the question whether this physician was negligent.

I also feel that evidence of proximate cause is inadequate. The uncontradicted testimony offered showed that a proper repair of the ureter was made by a competent urologist, that tests on November 11, 1970, and February· 16, 1971, reflected that this ureter was normal. that appellant's principal complaint was urinary incontinence, that this condition would not follow from the surgery performed, and that appellant had a previous history of urogenital problems. I do not see how the severing of this ureter can be said to have been the proximate cause of appellant's condition in the absence of medical testimony based upon scientific knowledge of the subject.

I would affirm the judgment.