568 P.2d 600

William GOFFE, Plaintiff-Appellant,

v.

PHARMASEAL LABORATORIES, INC., a California Corporation, Dr. J. Hunt Burress and Presbyterian Hospital Center, Inc., a New Mexico Corporation, Defendants-Appellees.

No. 2480.

Court of Appeals of New Mexico.

Dec. 7, 1976.

James R. Toulouse, Phil Krehbiel, Toulouse, Krehbiel & DeLayo, P.A., Albuquerque, for plaintiff-appellant.

James M. Dines, Shaffer, Butt, Jones & Thornton, Albuquerque, for defendant-appellee Pharmaseal Laboratories, Inc.

Richard Civerolo, Civerolo, Hansen & Wolf, Albuquerque, for defendant-appellee Dr. J. Hunt Burress.

J. T. Paulantis, Johnson, Paulantis & Lanphere, Albuquerque, for defendant-appellee Presbyterian Hospital Center, Inc.

## OPINION

HERNANDEZ, Judge.

Plaintiff appeals the granting of a summary judgment in favor of the defendants.

On August 26, 1971, plaintiff entered the defendant Presbyterian Hospital (Hospital) suffering from an intestinal obstruction. He was treated by defendant Dr. J. Hunt Burress. The treatment consisted of inserting a K–2R Kaslow intestinal tube, manufactured by defendant Pharmaseal Laboratories, Inc. (Laboratory), through his nose, and thence through the stomach into the intestine. To help in inserting the tube into the intestine, it was weighted with a small rubber balloon tied to the end of the tube and containing metallic mercury, also called quicksilver. The tube, balloon and quicksilver were purchased from the Hospital. Dr. Burress put the mercury into the balloon and tied it onto the end of the tube. On the morning of August 30, 1971, the intestinal obstruction having been removed, Dr. Burress started to withdraw the tube. While he was in the process of removing the tube, the balloon containing the mercury broke as the bag started to enter the nasal passage. As a consequence, the plaintiff inhaled some of the mercury into his lungs. Dr. Burress, with the help of some of the hospital staff, turned the plaintiff upside down and pounded him on the back to cause him to cough up the mercury. How much he

inhaled is not known and how much stayed in his system is not known. There is nothing in the record to indicate that the mercury being in his system had any adverse effects. The tube and the balloon were disposed of and no one had the opportunity to examine them. On the day following these events the plaintiff suffered a myocardial infarction.

Plaintiff in his complaint alleged that Dr. Burress "did not exercise the degree of care or skill ordinarily exercised by others of his profession in similar treatment in that he removed said tube in a hasty, negligent, and unskilled manner, resulting in the rupture of a bag of mercury . . . ." He further alleged that Dr. Burress directed others to pound him on the back to remove the mercury and this "pounding resulted in a coronary thrombosis with a subsequent myocardial infarction." As to the Laboratory, the plaintiff alleged that the "tube was in a defective condition unreasonably dangerous to a user or patient in that the bag of mercury attached to the tube in the treatment is improperly designed and unsafe to persons undergoing treatment . . . ." Also, that the tube "was not of a merchantable quality nor was it fit for the purpose for which it was intended." That the Laboratory had "breached an implied warranty of merchantibility and fitness . . . ." In regard to the Hospital, the plaintiff alleged that Dr. Burress was its agent or employee and that in doing the various things he did he was acting within the scope of his employment.

The plaintiff alleges four points of error. We will discuss together points 1, 3 and 4, which are as follows:

"POINT I
"SUMMARY JUDGMENT WAS IMPROPER—ISSUES OF FACT FOR THE JURY TO DECIDE EXISTED.

                *    *    *    *    *    *

"POINT III
"EVEN IF DEFENDANTS ESTABLISHED THE LACK OF MATERIAL ISSUES, PLAINTIFF MET HIS BURDEN OF COMING FORTH WITH TANGIBLE EVIDENCE DEMONSTRATING THAT THERE EXISTS A TRIABLE ISSUE OF FACT, PRECLUDING SUMMARY JUDGMENT.

"POINT IV
"EVEN IF THE STRICT LOCALITY RULE HAS NOT BEEN SATISFIED, THE STANDARD TO BE USED IS A NATIONAL ONE, NOT LOCAL."

Section 21–1–1(56)(c), N.M.S.A. 1953 (Repl. Vol. 4) provides in pertinent part that: "The [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Our Supreme Court in *Goodman v. Brock*, 83 N.M. 789, 498 P.2d 676 (1972) adopted the following language from 3 Barron & Holtzoff, Federal Practice and Procedure, § 1234 at 124–126 (rev'd Wright 1958) as the rule to be applied in determining whether a motion for summary judgment should be granted or not:

" . . . the party opposing the motion is to be given the benefit of all reasonable doubts in determining whether a genuine issue exists. If there are such reasonable doubts, summary judgment should be denied. A substantial dispute as to a material fact forecloses summary judgment."

The Supreme Court went on to say that once the moving party has made a prima facie showing that he is entitled to summary judgment, the burden shifts to the opposing party to show that there is a genuine factual issue. "By a prima facie showing is meant such evidence as is sufficient in law to raise a presumption of fact or establish the fact in question unless rebutted. . . The inferences, which the party opposing the motion for summary judgment is entitled to have drawn from all the matters properly before and considered by the trial court, must be *reasonable* inferences." [Emphasis ours.] The rules governing consideration of medical malpractice cases are set forth in *Cervantes v. Forbis*, 73 N.M. 445, 389 P.2d 210 (1964):

"Before a physician or surgeon can be held liable for malpractice in the treatment of his patient, he must have departed from the recognized standards of medical practice in the community, or must have neglected to do something required by those standards. [Citations omitted.] The fact that a poor result is achieved or that an unintended incident transpired, unless exceptional circumstances are present, does not establish liability without a showing that the result or incident occurred because of the physician's failure to meet the standard either by his acts, neglect, or inattention. Such facts must generally be established by expert testimony. [Citations omitted.] Likewise, expert testimony is generally required to establish causal connection."

■ Furthermore, the medical expert or experts must be qualified to express an opinion concerning the recognized standard of medical practice in the community and an opinion that the defendant departed from that standard or neglected to do something required by the standards. *Gandara v. Wilson*, 85 N.M. 161, 509 P.2d 1356 (Ct. App. 1973).

■ At the outset of our discussion, it is well to remind ourselves that a medical malpractice suit is a negligence action. The elements necessary to such a cause of action are:

"1. A duty, or obligation, recognized by the law, requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks.

"2. A failure on his part to conform to the standard required. These two elements go to make up what the courts usually have called negligence; but the term quite frequently is applied to the second alone. Thus it may be said that the defendant was negligent, but is not liable because he was under no duty to the plaintiff not to be.

"3. A reasonable [sic] close causal connection between the conduct and the resulting injury. This is what is commonly known as 'legal cause,' or 'proximate cause.'

"4. Actual loss or damage resulting to the interests of another." W. Prosser, Law of Torts, § 30, p. 143 (4th ed. 1971)

■ Speaking to the question of standard and a departure therefrom, Dr. Burress relies upon the deposition testimony and affidavit of Dr. A. Simms II, a surgeon residing and practicing in Albuquerque. Dr. Simms in his deposition testimony described the procedure for inserting and removing the tube. His affidavit recited in part:

"8. That Mr. Goffe was again seen by Dr. Simms on April 28, 1972, at which time he related the above episode of intestinal obstruction and told of the use of the mercury-weighted tube. He also told of the mishap in removing the tube.

"9. That Dr. Simms has reviewed the deposition of Dr. Burress in detail.

"10. That in Dr. Simms' opinion, the application and handling of the mercury-weighted intestinal tube by Dr. Burress fell within the acceptable standards of surgical care in this community."

The plaintiff for his part relies upon the affidavit and deposition of Dr. John W. Ormsby, an internist who graduated from Columbia Medical School and practices in the State of Washington. The pertinent parts of the doctor's affidavit are the following:

"That the practice of medicine in the State of Washington is of the same standard of care as practiced by physicians in the City of Albuquerque, State of New Mexico.

"Mr. Goffe related to me a description of the incident and I have reviewed the medical records furnished to me by Presbyterian Hospital; if the attending physician vigorously pulled against the obstruction to such a degree as to cause the balloon to rupture, it is my opinion that such action was not acceptable medical practice.

"It is my further opinion that if the attending physician did not vigorously pull against the obstruction to such a

decree [sic] as to cause the balloon to rupture, then the naso-gastric tube would have been defective."

The record reveals that Dr. Ormsby at his deposition was asked the following questions and gave the following answers among others:

"Q. Can you say as a matter of medical probability [that] the breakage and spillage of the mercury was caused by any of the acts of Doctor Burress?

\* \* \* \* \* \*

"A. No, I can't put a term 'probability' on that. I really don't know.

\* \* \* \* \* \*

"Q. Can you tell me specifically what, if anything, Doctor Burress did wrong?

"A. No, sir, I can't tell you anything specifically that I know he did wrong.

"Q. As far as you know, he did nothing wrong and everything met the standard of care with which you are familiar?

"A. Yes, as far as I know, he did nothing wrong."

Dr. Ormsby, when asked whether it was the vigorous pulling by Dr. Burress or a defect in the tube which caused it to break, answered:

"A. No. I can't say because I really don't know, and I am not even sure I would know if I had been there.

. . .

\* \* \* \* \* \*

"Q. Well, can you really even tell us, as a matter of medical probability, that it was even defective?

\* \* \* \* \* \*

"A. No, I have no knowledge that it was defective."

The purpose of a summary judgment proceeding is to expedite litigation by determining whether a party possesses competent evidence to support his pleadings so as to raise genuine issues of material fact and if not to dispose of the matters at that state of the proceeding. *Agnew v. Libby*, 53

N.M. 56, 201 P.2d 775 (1949). Dr. Ormsby's affidavit and deposition testimony is all that the record contains of plaintiff's evidence as to standard and failure to meet that standard. The affidavit of plaintiff's wife and his own deposition testimony and answers to interrogatories cannot be considered because they are not competent to testify as medical experts as to either of these matters. As was pointed out in *Cervantes, supra*, proof of malpractice requires evidence as to the recognized standard in the community and a showing that the doctor departed from that standard due to the lack of the requisite knowledge or lack of the requisite skill or failure to exercise the requisite care. However, because of the technical and specialized subject matter, expert medical testimony is usually required to establish both of these evidentiary steps. Plaintiff does not contend that this is a situation where laymen are competent to testify.

Assuming, without deciding, that the standard in the State of Washington is the same as in the Albuquerque community; and further assuming, without deciding, that Dr. Ormsby possessed the requisite medical expertise to give an opinion on this matter; his statements are of no help to the plaintiff.

■ Dr. Ormsby's affidavit and deposition testimony contains nothing as to the standard; and as to the departure from that standard the most that can be said about the testimony is that it presents an equal choice of two mere possibilities. Our Supreme Court in *Stambaugh v. Hayes*, 44 N.M. 443, 103 P.2d 640 (1940) quoted the following with approval from *P. F. Collier and Son Co. v. Hartfeil*, 72 F.2d 625 (8th Cir. 1934): "Where evidence is equally consistent with two hypotheses, it tends to prove neither." That is to say the mere choice of possibilities does not constitute competent evidence. "Competent evidence means that which the very nature of the things to be proved requires as the fit and appropriate proof in the particular case." *Chiordi v. Jernigan*, 46 N.M. 396, 129 P.2d 640 (1942). The plaintiff having failed to

show that there were genuine material issues of fact as to two of the essential elements of his cause of action against Dr. Burress and the Hospital, the trial court properly granted the motion for summary judgment as to them. Granting summary judgment as to Dr. Burress requires granting it also as to the Hospital because plaintiff's cause of action against the Hospital is premised on Dr. Burress being either its agent or its employee. *Smith v. Klebanoff,* 84 N.M. 50, 499 P.2d 368 (Ct.App. 1972); cert. denied, 84 N.M. 37, 499 P.2d 355 (1972).

■ The Laboratory failed to make an affirmative showing that there were no genuine issues of material fact as to it. Consequently, the burden did not shift to the plaintiff to show otherwise. Although parts of Dr. Ormsby's and Dr. Simm's deposition testimony are helpful to the Laboratory, these statements are not enough to make the affirmative showing necessary to shift the burden to plaintiff. Dr. Ormsby stated that he did not know whether the tube and bag were defective. Dr. Simms, speaking about these bags, said "occasionally, they will break. There is no way to keep from it." The trial court erred in granting summary judgment as to the Laboratory. *Kelly v. Board of Trustees of Hillcrest General Hospital, Inc.,* 87 N.M. 112, 529 P.2d 1233 (Ct.App. 1974); cert. denied, 87 N.M. 111, 529 P.2d 1232 (1974).

■ Plaintiff's second point is that "summary judgment was improper since the doctrine of res ipsa loquitur defeats the motion for summary judgment." He argues that "the only inference to be drawn is that the accident would not have occurred but for the negligence of the attending doctor or the defectiveness of the tube." As was stated in *Renfro v. J. D. Coggins Company,* 71 N.M. 310, 378 P.2d 130 (1963), in order to make the doctrine of res ipsa loquitur applicable, two elements must be present:

"(1) that the accident be of the kind which ordinarily does not occur in the absence of someone's negligence; (2) that it must be caused by an agency or instrumentality within the exclusive control and management of defendant."

And as the Supreme Court also said in this case, more than the happening of an accident is required to set the doctrine in operation.

■ First as to Dr. Burress and the Hospital, we believe that the plaintiff failed to make a prima facie showing as to the first element, negligence. The only evidence that plaintiff presented which would go to this element was the deposition testimony and affidavit of Dr. Ormsby. We have previously discussed the shortcomings of that evidence as to the requisite medical standard and failure to observe the standard; it is equally deficient as to this first element. Dr. Ormsby did not say that this was the kind of incident which ordinarily does not occur in the absence of someone's negligence. Dr. Simms in his deposition testimony had this to say after discussing the procedures used:

"A. Oh, no. You are undoubtedly referring to occasional accidents when you remove a tube, where the bag will break and suddenly dump the mercury wherever it's at.

"Q. Well, is that a good thing to do that in the throat, so it gets into the throat?

"A. Oh, no, it's not, but it's very difficult to avoid. Impossible at times.

"Q. Why would you say that?

"A. Because I have removed hundreds of them and, occasionally, they will break. There's no way to keep from it."

The plaintiff failed to meet the burden of establishing that there was a question of material fact as to the first element of the doctrine. The doctrine is not applicable to the Laboratory because the instrumentality was in the exclusive control and management of Dr. Burress. The trial court properly ruled that the doctrine of res ipsa loquitur was not applicable.

The summary judgment is affirmed as to Dr. Burress and the Hospital. It is reversed as to the Laboratory. We would point out to the trial court that the counter-

claim of the Hospital against the plaintiff remains unresolved, as does the cross claim of the Laboratory against the Hospital and Dr. Burress.

IT IS SO ORDERED.

LOPEZ, J., concurs.

SUTIN, J., concurs in part and dissents in part.

SUTIN, Judge (concurring in part and dissenting in part).

I concur in the reversal of summary judgment in favor of defendant Pharmaseal. I dissent in the affirmance of summary judgment in favor of Dr. Burress and Presbyterian Hospital.

The purpose of this dissent is not to declare defendants liable. That is not the function of this Court in an appeal from summary judgment. Our function is to determine whether a genuine issue of material fact exists. If it does exist, the jury shall then decide by verdict whether plaintiff is entitled to recover damages. The medical malpractice explosion should not deter this Court in scrutinizing the facts and the law.

A. *Summary judgment did not hasten the administration of justice.*

The claimed act of malpractice occurred August 30, 1971. The complaint was filed May 23, 1973. On October 21, 1974, seventeen months later, the trial setting of November 26, 1974 was vacated because considerable discovery was yet to be had. On February 27, 1975, defendant Pharmaseal moved to vacate the trial setting of April 29, 1975 because plaintiff's deposition was not taken until February 11, 1975. On April 21, 1975, almost two years after the complaint was filed, the trial setting was vacated a second time. On September 15, 1975, notice was issued of a pretrial conference to be held September 24, 1975. It was not held. It was reset in December. On November 26, 1975, plaintiff submitted interrogatories to defendant Pharmaseal. On December 1, 1975, the trial setting was vacated a third time and the court ordered that there shall be no continuance or vacat-

ing of the February, 1976 trial date. The trial date was set at Monday, February 2, 1976.

On January 16, 1976, almost three years after the complaint was filed, defendants moved for summary judgment. It was set for hearing on January 26, 1976. It was not heard on that date.

On January 26, 1976, the deposition of plaintiff's wife was taken *by defendants*. On January 29, 1976, *the defendants* took the depositions of plaintiff's witnesses, Doctors John W. Ormsby and Bernard S. Goffe in Seattle, Washington. *Plaintiff* took the deposition of Doctor G. Gordon Hale on January 30, 1976. On January 30, 31, 1976, *plaintiff* took the depositions of Doctors J. E. Goss and A. G. Simms, II, in Albuquerque.

On the morning of February 2, 1976, before the selection of the jury, defendants' motion for summary judgment was heard. After 94 pages of rambling argument, which took approximately two hours, the trial court granted all defendants a summary judgment without consideration of plaintiff's medical testimony. Two and two-thirds years had passed since the complaint was filed and four years and five months after the claimed act of malpractice. The trial court chose the summary judgment route rather than the trial by jury route.

More than five years have now elapsed since the claimed act of malpractice. Summary judgment, under the circumstances of this case, on the morning of trial, was an act of injustice to plaintiff.

In a specially concurring opinion, I said:

Summary judgment is a dangerous instrument in the administration of justice when it denies a party the right to trial based upon factual issues. The obvious purpose of the rule from its origin in New Mexico in 1949, was to hasten the administration of justice and to expedite litigation by avoiding needless trials. *Agnew v. Libby*, 53 N.M. 56, 201 P.2d 775 (1949). This has not proven true in actual experience.

The history of Rule 56(c) in New Mexico indicates that summary judgment does not hasten the administration of justice; that trial courts decide issues and grant summary judgments which, they believe, avoids a large trial docket. In the vast majority of summary judgments appealed, reversals occurred, and trial denied was trial delayed. It is the policy of courts of review to grant the right of trial whenever justice demands it. Trial courts must find a legal rather than a factual issue upon which to grant summary judgment.

*Tapia v. McKenzie*, 83 N.M. 116, 120, 489 P.2d 181, 185 (Ct.App. 1971).

In medical malpractice actions, summary judgment should not be a substitute for trial on the merits because, generally, the ultimate decision will be based on opinions of opposing medical experts or on the judicial determination of subjective facts. Expert opinion testimony is often based on facts or data made known to the expert, even though the facts or data are not admissible in evidence. Rules 702, 703 and 704 of the New Mexico Rules of Evidence [§§ 20-4-702, 703, 704, N.M.S.A.1953 (Repl. Vol. 4, 1975 Supp.)].

Summary judgment procedure involves a determination of whether there is a "genuine issue as to any material fact." Rule 56(c). This "material fact" relates to the events, or happenings or circumstances which give rise to a medical malpractice claim. In the instant case, the "material facts" relate to a mechanical, non-technical procedure undertaken by Dr. Burress and the proximate cause of the injury suffered by the plaintiff.

The "conspiracy of silence" in the medical field places a heavy burden on patients, and expert medical testimony of opposing doctors should be accepted with caution in making the determination of a "genuine issue as to any material fact."

Where defendants seek summary judgment, plaintiff is entitled to the benefit of all reasonable doubts in determining whether a genuine issue exists as to any material fact in the case. *Skarda v. Skarda*, 87 N.M.

497, 536 P.2d 257 (1975). This means that the trial court and this Court are required to resolve all doubts in connection therewith against the defendants. *Cervantes v. Forbis*, 73 N.M. 445, 389 P.2d 210 (1964). Where depositions and affidavits are filed, it is the function of the trial court to gather all of the facts presented to determine whether a genuine issue of fact exists with reference to whether defendants failed to exercise that degree of care which an ordinarily prudent person would have exercised in the fulfillment of the duty to protect plaintiff from injury. On appeal, we will review the testimony in the most favorable aspect it will bear in support of plaintiff's claim of the right to present the merits to the jury. *Coca v. Arceo*, 71 N.M. 186, 376 P.2d 970 (1962).

Under the circumstances of this case, the continued procedural delay, the late taking of medical depositions, the decision on summary judgment immediately after medical depositions were taken with a jury being present, and the large expense involved, mean to me that "we cannot countenance procedures in which the rights of parties are prejudiced or their substantive rights invaded, or in which trials are had on the issue of whether trials should be had." *Summers v. American Reliable Insurance Company*, 85 N.M. 224, 226, 511 P.2d 550, 552 (1973).

My review of this case indicates to me that the primary reason for the summary judgment was the application of the "strict locality" rule, to deprive plaintiff of the right to use medical depositions taken in the State of Washington.

To grant summary judgment after the claimed act of malpractice, without consideration of plaintiff's testimony and medical evidence based thereon, does not hasten the administration of justice.

B. *The "strict locality rule" was not involved.*

The only claim of malpractice in this case arises out of the withdrawal of an intestinal tube through plaintiff's nose by Dr. Bur-

ress, the manner of which resulted in the collapsing of a mercury-weighted bag. *The manner of withdrawal was a mechanical, non-technical procedure.* The withdrawal was not the unfortunate result of an operation, nor care involved in the treatment or diagnosis of a patient. Neither did withdrawal involve the care and skill of a specialist. We are not confronted with a *standard* of medical care. The "strict locality rule" was not involved.

We must distinguish the difference between the concept of a standard of medical practice and the concept of ordinary negligence. In medical malpractice actions, the standard of care is that degree of skill and learning which is ordinarily possessed and exercised by members of the medical profession in good standing. A physician or surgeon who has conformed to the standard of the profession in medical practice cannot be found negligent. In negligence actions, the standard of care is that degree of care which a reasonably prudent person would exercise under the same or similar circumstances.

We must not confuse these terms. Expert testimony is necessary to establish a *standard* of care and departure therefrom when the condition is such that knowledge about it is peculiarly within the knowledge of medical men. "However, where negligence on the part of a doctor is demonstrated by facts which can be evaluated by resort to common knowledge, expert testimony is not required." *Mascarenas v. Gonzales*, 83 N.M. 749, 751, 497 P.2d 751, 753 (Ct.App. 1972). Cited as authority is *Lanier v. Trammell*, 207 Ark. 372, 180 S.W.2d 818 (1944). In that case, the court held that expert testimony was not required when the asserted negligence lay within the comprehension of a jury of laymen, such as a surgeon's failure to sterilize his instruments or to remove a sponge from the incision before closing it. *Pry v. Jones*, 253 Ark. 534, 487 S.W.2d 606 (1972). For additional samples, see authorities cited in *Lanier, supra*; Annot., 141 A.L.R. 5 at 12 (1942), supplemented in Annot., 81 A.L.R.2d 597 at 608 (1962), and Later Case Service (1968 and 1976).

Expert testimony is not required in medical malpractice if the jury is capable of appreciating and evaluating the significance of the events that occurred. These events include those which are of a mechanical, non-technical nature which a layman might well comprehend and understand. A jury does not need guidance and enlightenment. The concept of ordinary negligence comes into play. This rule is applicable to a mechanical, non-technical procedure such as the withdrawal of an intestinal tube through a patient's nose. Under this event, a *standard* of care in medical practice disappears.

The strict locality rule was not applicable because a *standard* of medical practice was not present.

C. *If a standard of care was involved, a national standard controlled.*

Dr. Albert G. Simms, II, an Albuquerque physician and surgeon, stated that the use of gastrointestinal tubes is standardized nationwide. He testified as follows:

The training of surgical residents in the United States in the last 30 years has pretty well standardized things like insertions of tubes and the use of tubes and so on, although any one hospital or any one physician might have certain little gimmicks that he uses with success. But, by and large, the use of a mercury-weighted long tube has been commonplace in the United States since the introduction of the Miller-Abbott Tube in about 1934.

Doctors Ormsby and Goff of Seattle, Washington, declared that the standard of care in Albuquerque is the same standard of care in Seattle. The testimony of doctors from Seattle, Washington, is competent testimony on the procedures used by Dr. Burress in Albuquerque.

*Los Alamos Medical Center v. Coe*, 58 N.M. 686, 275 P.2d 175 (1954) preceded *Cervantes v. Forbis, supra*. In *Coe*, the Supreme Court held that a Los Angeles surgeon was allowed to testify that defendant's patient in New Mexico was addicted to a drug. "Thus, it might be successfully

argued from *Coe* that, in New Mexico, the question of a physician's negligence in common medical matters may be determined by testimony of doctors from throughout the country who are knowledgeable in the particular field." Roehl, The Law of Medical Malpractice in New Mexico, 3 N.M.L.Rev. 294 at 298 (1973). I agree.

In 1964, the strict locality rule was adopted in New Mexico. *Cervantes v. Forbis, supra.* In 1973, this Court reluctantly declined to modernize the rule. We did suggest that the Supreme Court review *Cervantes* in the light of U.J.I. 8.1. *Gandara v. Wilson*, 85 N.M. 161, 509 P.2d 1356 (Ct.App. 1973). This instruction was approved in *Williams v. Vandenhoven*, 82 N.M. 352, 482 P.2d 55 (1971). All that is necessary to adopt a national standard is to eliminate the words "in the community" from the rule stated in *Cervantes.*

It should be noted under U.J.I. 8.2 that the duty of a specialist in medical practice is not limited to any locality.

I believe that U.J.I. 8.1 and 8.2, approved by the Supreme Court, modified the strict locality rule in *Cervantes.*

U.J.I. 8.1 provides that "due consideration" should be given "to the locality involved." "The 'locality rule' has no present-day vitality except that it may be considered as *one* of the elements to determine the degree of care and skill which is to be expected of the average practitioner of the class to which he belongs. . . . In other words, local practice within geographic proximity is one, but not the only factor to be considered." *Pederson v. Dumouchel*, 72 Wash.2d 73, 431 P.2d 973, 978, 31 A.L. R.3d 1100 (1967); *Shier v. Freedman*, 58 Wis.2d 269, 206 N.W.2d 166 (1973); *Brune v. Belinkoff*, 354 Mass. 102, 235 N.E.2d 793 (1968).

There appears to be a vast conglomeration of cases on the modernization of the "strict locality rule". Malpractice Testimony: Competency of physician or surgeon from one locality to testify, in malpractice cases, as to standard of care required of defendant practicing in another locality, 37 A.L.R.3d 420 (1971); King: In Search of a

Standard of Care for the Medical Profession: The "Accepted Practice" Formula, 28 Vanderbilt L.Rev. 1213 (1975); *Edwards v. United States*, 519 F.2d 1137 (5th Cir. 1975), dissenting opinion.

A review of the history of the "strict locality rule" and the reasons for modernization have led to the adoption of a nationwide standard of care. *Shilkret v. Annapolis Emergency Hospital Ass'n*, 276 Md. 187, 349 A.2d 245 (1975); *Blair v. Eblen*, 461 S.W.2d 370 (Ky. 1970); *Pederson v. Dumouchel, supra.* In *Shilkret, supra*, Judge Levine stated the rule as follows:

> We align ourselves with the Kentucky court and hold that a physician is under a duty to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs, acting in the same or similar circumstances. Under this standard, advances in the profession, availability of facilities, specialization or general practice, proximity of specialists and special facilities, together with all other relevant considerations, are to be taken into account. [349 A.2d at 253].

With regard to the rule applicable to hospitals, the following was adopted:

> We hold, therefore, that a hospital is required to use that degree of care and skill which is expected of a reasonably competent hospital in the same or similar circumstances. As in cases brought against physicians, advances in the profession, availability of special facilities and specialists, together with all other relevant considerations, are to be taken into account. [349 A.2d at 254].

This trend in the modernization of the "strict locality rule" has reached its summit. With the adoption of this rule, we will avoid the "conspiracy of silence." In *Graham v. Sisco*, 248 Ark. 6, 449 S.W.2d 949 (1970), the Court said:

> It is quite evident that if the members of the medical profession, the legal profession, or any similar occupation, can prevent a malpractice case from even coming to trial simply by agreeing not to

testify against one another, very few such cases will be heard in the future. Such a "conspiracy of silence," as it is usually called, would allow the most grossly negligent practitioner to avoid even the simple duty of making his own explanation, under oath, of how the plaintiff happened to be injured. With the issues now before us by no means free from doubt, we are wholly unwilling to sanction a procedure fraught with such serious possibilities of injustice to future litigants. [449 S.W.2d at 951].

In *Faulkner v. Pezeshki*, 44 Ohio App.2d 186, 337 N.E.2d 158, 164 (1975), the Court said:

Locating an expert to testify for the plaintiff in a malpractice action is known to be a very difficult task, mainly because in most cases, one doctor is reluctant and unwilling to testify against another doctor. Although doctors may complain privately to each other about the incompetence of other doctors, they are extremely reluctant to air the matter publicly. [337 N.E.2d at 164].

Where compelling reasons exist in medical malpractice actions, the Supreme Court will accept jurisdiction to establish a standard of care required of physicians and surgeons. *Kronke v. Danielson*, 108 Ariz. 400, 499 P.2d 156 (1972).

D.  *There are genuine issues of material fact.*

(1) *The proximate cause of plaintiff's heart attack.*

The trial court also granted summary judgment because plaintiff failed to prove any causal relationship between the withdrawal of the tube, the collapse of the mercury-weighted bag, and the resulting heart attack.

Defendants presented evidence by Dr. Burress and local physicians that no causal relationship existed.

Plaintiff presented the following evidence.

Plaintiff was 61 years of age at the time of the event in Presbyterian Hospital. On the insertion of the tube, Dr. Burress estimated he put four or five cc's of mercury in the bag, but he did not measure the amount. On the removal of the intestinal tube, Dr. Burress pulled the tube fast, jerked it three times, vigorously or forcefully or heavily pulled on the tube as though it had been stuck, and then yanked it out. The amount of mercury put in the bag may have contributed to this problem. After the collapse of the mercury-weighted bag and spillage of mercury, plaintiff was taken to the x-ray room, then returned to his own room where he was put on a tilt table with his head down lower than his feet. Dr. Burress asked the physiotherapy department to assist in postural drainage of the mercury. Physiotherapy employees pounded on plaintiff's back many times for several hours to help remove the mercury. Plaintiff's head hit the foot of the bed. He had chest pain. The next morning plaintiff suffered a myocardial infraction, a coronary heart attack.

Dr. John W. Ormsby, 45 years of age, a licensed physician in the State of Washington, specialized in internal medicine, endocrinology, and metabolism. He had training in cardiology for three years commensurate with his program in internal medicine. He had used an intestinal tube in his practice, absent the mercury-weighted tube. He examined plaintiff six times during the years 1969, 1970 and 1972. He had performed electrocardiograms and considered plaintiff to be within normal limits for his age. He reviewed plaintiff's medical records of the incident that occurred on August 30, 1971, had conversations with plaintiff and others and had correspondence with physicians in Albuquerque. Based upon these and additional facts, and with a medical explanation, Dr. Ormsby concluded that there was a causal relationship between the withdrawal of the tube, the collapse of the mercury bag, the procedure used to extract the mercury and plaintiff's heart attack.

Dr. C. Gordon Hale, who specializes in internal medicine with a subspecialty in cardiology, testified that a causal relationship existed.

There was a genuine issue of material fact on the proximate cause of plaintiff's heart attack.

### (2) The Negligence of Dr. Burress.

Dr. Burress testified that care was exercised during the withdrawal of the tube, and the procedure used to extract the mercury. Plaintiff's evidence is to the contrary. A genuine issue of material fact exists on the negligence of Dr. Burress.

### (3) The doctrine of res ipsa loquitur is applicable.

The trial court also granted summary judgment because the doctrine of res ipsa loquitur was not applicable.

"New Mexico decisions discussing res ipsa loquitur in malpractice cases have not applied the doctrine. These decisions have not held the doctrine could not be applied in an appropriate case." Smith v. Klenbanoff, 84 N.M. 50, 55, 499 P.2d 368, 373 (Ct.App. 1972).

Two essential elements are necessary to allow the use of the doctrine: (1) that the injury to plaintiff was proximately caused by the collapse of the mercury-weighted bag in the withdrawal of the intestinal tube, which was under the exclusive control and management of the defendant, and (2) that the event causing the injury to the plaintiff was of a kind which ordinarily does not occur in the absence of negligence, on the part of the doctor who was in control of the instrumentality. U.J.I. 12.14. Waterman v. Ciesielski, 87 N.M. 25, 528 P.2d 884 (1974).

Res ipsa loquitur is in a quagmire of judicial discussion in medical malpractice cases. Annot., 162 A.L.R. 1265 (1946), supplemented in Annot., 82 A.L.R.2d 1262 (1962) and Later Case Service (1968 and 1976); Walker, Parker, Williamson, The Application of Res Ipsa Loquitur in Texas Medical Professional Liability Actions, 12 Houston L.Rev. 1026 (1975); 70 C.J.S. Physicians and Surgeons § 62 at 991 (1951); 61 Am.Jur.2d Physicians, Surgeons, Etc., §§ 191–197 (1972); Bardessono v. Michels, 3 Cal.3d 780, 91 Cal.Rptr. 760, 478 P.2d 480 (1970), 45 A.L.R.3d 717 (1972).

Each case must be decided on its own facts. As heretofore pointed out, the negligence of Dr. Burress involves a mechanical, non-technical procedure in which expert testimony is not required.

Plaintiff's complaint did not allege the doctrine of res ipsa loquitur. It alleged that "during the removal of said intestinal tube, Defendant, Dr. Burress . . . removed said tube in a hasty, negligent, and unskilled manner, resulting in the rupture of a bag of mercury at the end of the tube in the nasal passage of Plaintiff". These are general allegations of negligence and the doctrine of res ipsa loquitur is applicable, though not pleaded. Mares v. New Mexico Public Service Co., 42 N.M. 473, 82 P.2d 257 (1938).

"The doctrine of res ipsa loquitur is a rule of evidence peculiar to the law of negligence which recognizes that prima facie negligence may be established without direct proof and furnishes a substitute for specific proof of negligence." 65A C.J.S. Negligence § 220.4 (1966). "There must be some showing that the cause of the accident is directly or naturally the result of some act or condition with which the defendant is connected and which ordinarily does not happen if those who have control or management exercise proper care." Renfro v. J. D. Coggins Company, 71 N.M. 310, 316, 378 P.2d 130, 135 (1963).

In the instant case, the evidence most favorable to plaintiff shows that (1) Dr. Burress had exclusive control and management of the withdrawal of the intestinal tube, and the injury to the plaintiff was proximately caused by the manner in which Dr. Burress withdrew the intestinal tube and caused the mercury-weighted bag to collapse; (2) at the time the bag collapsed, Dr. Burress said, "My God, this has never happened before." The result of the act, the collapse of the tube, does not ordinarily happen if proper care is exercised.

With this evidence, the doctrine of res ipsa loquitur is applicable, and plaintiff is entitled to an inference of defendants' negligence.

The introduction of evidence by plaintiff to prove specific acts of negligence does not deny its application. Plaintiff is entitled to rely on the doctrine. He should not be penalized by the loss of the inference because he has been willing to go forward and do the best he can to prove specific acts of negligence. *Tuso v. Markey*, 61 N.M. 77, 294 P.2d 1102 (1956); *Harless v. Ewing*, 81 N.M. 541, 469 P.2d 520 (Ct.App. 1970); *Terry v. Dunlap*, 84 N.M. 86, 499 P.2d 1008 (Ct.App. 1972) (Sutin, J., dissenting).

Other issues raised by plaintiff were not answered in the majority opinion. I decline to extend this dissent.

The summary judgment in favor of Dr. Burress and Presbyterian Hospital should be reversed.