# IN THE COURT OF APPEALS OF IOWA

No. 17-0716
Filed September 26, 2018

**ROGER WADDELL, Administrator of the Estate of CHRISTINA WADDELL,**
Plaintiff-Appellant,

**vs.**

**UNIVERSITY OF IOWA COMMUNITY MEDICAL SERVICES, INC. d/b/a UNIVERSITY OF IOWA QUICK CARE NORTH LIBERTY, a/k/a UI FAMILY CARE CENTER NORTH LIBERTY,**
Defendant-Appellee.

_____

Appeal from the Iowa District Court for Johnson County, Paul D. Miller,

Judge.


Plaintiff appeals the summary judgment order dismissing a medical

malpractice action. **AFFIRMED.**



James K. Weston II of Tom Riley Law Firm, PLC, Iowa City, for appellant.

Desirée A. Kilburg, Constance M. Alt, and Nancy J. Penner of Shuttleworth

& Ingersoll, PLC, Cedar Rapids, for appellee.



Heard by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**MULLINS, Judge.**

The plaintiff appeals from the district court's summary judgment order dismissing the medical malpractice lawsuit against the defendant. The court concluded the plaintiff failed to establish essential elements of his claim.

## I.    Background Facts and Proceedings

On June 10, 2011, Christina Waddell sued University of Iowa Community Medical Services, Inc, (UICMS) d/b/a University of Iowa Quick Care North Liberty (Quick Care) a/k/a UI Family Care Center North Liberty (Family Care).[1] She alleged negligence in the medical care she received at Quick Care and Family Care for failing to diagnose and treat cancer in her finger during visits to two of its clinics.

Quick Care and Family Care operate out of the same facility. Family Care offers services during normal business hours, including services dealing with long-term health care issues. Quick Care is a walk-in medical clinic providing services during evening hours and Saturday mornings, and it is geared toward more common illnesses, such as the flu or strep throat. If other or further medical care is required, Quick Care refers the individual to a primary care physician or an emergency room.

In June 2009, Christina presented at Quick Care with a sore on the ring finger of her left hand and a rash on her face. A nurse practitioner diagnosed Christina with a fungal infection, prescribed a topical medication, and advised her to follow up with a primary care physician. Christina returned to Quick Care in July

---

[1] The suit initially included the State of Iowa as a defendant. The court granted the State of Iowa's motion for summary judgment and dismissed it as a party in September 2012.

and presented to a physician's assistant with complaints that, despite using the prescribed topical medication, the sore on her ring finger had not improved, her fingernail slid off, and the rash on her face was still present. The physician's assistant removed the remaining fingernail and instructed Christina to soak the finger in Epsom salt and apply antibiotic ointment to her finger and topical creams to the facial rash. In August, Christina presented herself to Family Care for a non-healing nail bed. A physician referred Christina to the University of Iowa Hospitals and Clinics (UI) dermatology department for a possible biopsy with the concern of nail-bed cancer. An appointment was scheduled for August 11.[2] Christina was not seen on August 11 and an undated note on the referral form indicates the appointment was canceled in the system.[3]

In December, Christina presented at the UI dermatology department to Dr. Mary Stone with a lump on her ring finger that she stated began three years prior as a pink line then darkened. Christina also presented with the development of brown spots on her fingertip, which enlarged over the prior month. Dr. Stone conducted a biopsy, diagnosed Christina with malignant melanoma, and referred Christina to the oncology department.

On January 5, 2010, Dr. Mohammed Milhem, a UI oncologist, saw Christina for her melanoma treatment. In her history to Dr. Milhem, Christina indicated she had nail issues for the past two years, which began as a white streak that widened

---

[2] Notes on the referral form state attempts were made by Family Care to contact Christina about the appointment. The UI dermatology department also attempted to reach Christina by phone. The record does not indicate they were successful in reaching Christina. Her father was notified on August 6.

[3] The reason why and the person who cancelled the appointment are not in the record.

over time and darkened in color. She also reported that since 2008, her nail had softened in the middle. Christina told Dr. Milhem she visited Quick Care on two occasions for treatment of her fingernail. On each occasion she was prescribed a fungal cream. After neither cream worked, she stated she was then referred to the UI dermatology department. She did not mention any visit to Family Care. After his examination and discussion with the hospital tumor board, Dr. Milhem determined the best course of treatment was a wide excision of the tumor—i.e., amputation of the finger—and a biopsy of lymph nodes, which would govern decisions on further treatment.

On January 29, doctors amputated Christina's finger. At the same time, Dr. Hisakazu Hoshi, a surgical oncologist, performed a biopsy of Christina's lymph nodes and determined her cancer was stage three as the cancer had spread to a sentinel lymph node but not to an axillary node. Despite treatment, the cancer continued to spread to her lung, bone marrow, and brain. Christina died on March 30, 2012. After her death, her father, as administrator of her estate, was substituted as plaintiff in Christina's negligence suit. The plaintiff filed a designation of four experts, naming Kim Quinn, R.N., and Drs. Hoshi, Milhem, and Stone as experts who would testify on "issues of informed consent, standard of care, causation and damages."

In 2013, UICMS moved for summary judgment, alleging plaintiff's designated expert, Quinn, was not qualified to provide testimony on the applicable standards of care. UICMS additionally moved to strike Quinn's testimony. In the summary judgment motion, UICMS contended the plaintiff could not establish a prima facie case for medical malpractice due to a lack of causation evidence. The

court denied both of the motions. In its written ruling, the court held there were genuine issues of material fact as "[r]easonable minds could draw different inferences and reach different conclusions from the facts as presented through the testimony of Drs. Hoshi, Stone and Milhem." The court also concluded Quinn was "sufficiently qualified to testify regarding the operations, practices and policies of the clinic."

In August 2013, the defense filed a motion in limine, and in July 2015, it filed an updated trial brief, both of which presented issues with Quinn's expert opinions, her qualifications, and the element of causation. On April 6, 2017, the court held a hearing on the defense's motion and the issues raised in its updated trial brief. The plaintiff indicated his specific claims of negligence were for the failures to properly treat Christina's condition and refer her for additional care. He conceded he was unlikely to submit a claim based on a failure to properly diagnose. The court ruled Quinn was not qualified to testify about causation or on the treatment, care, or decisions made by the clinic personnel who treated Christina but she was "qualified to testify to her criticisms of the referral system and delay in scheduling and obtaining a referral." During the hearing, the court noted its concerns about causation.

On April 11, the court held a hearing on the defense's request to reconsider the 2013 summary judgment denial, based on the issue of causation. Because Quinn could not testify on the element of causation, this left the plaintiff to establish causation with the testimony of the four treating doctors, including the three designated as expert witnesses. The defense contended there was insufficient evidence on causation based on their expected trial testimony. The plaintiff

resisted, asserting the prior ruling was correct and noting the treating physicians testified by depositions that, with the type of cancer Christina had, the earlier the treatment, the better her chances of survival. The plaintiff argued the delay in treatment caused by the clinics hindered the ability of UI to treat Christina and limit the spread of her cancer. After reviewing the deposition testimony, the court concluded "there [was] no genuine issue of material fact on the issue of proximate cause. Defendant is entitled to a judgment as a matter of law." The court granted the renewed motion for summary judgment and dismissed the suit with prejudice.

On appeal, the plaintiff contends the court erred in granting summary judgment because no facts or law changed in the time period between the court's original denial of the motion for summary judgment in 2013 and the court's grant of the renewed motion in 2017.

## II.      Standard of Review

We review summary judgment rulings for the correction of errors at law. *Andersen v. Khanna*, 913 N.W.2d 526, 535 (Iowa 2018). Summary judgment is appropriate "if the record reveals only a conflict concerning the legal consequences of undisputed facts." *Nelson v. Lindaman*, 867 N.W.2d 1, 6 (Iowa 2015). "[W]e examine the record before the district court to determine whether any material fact is in dispute, and if not, whether the district court correctly applied the law." *Roll v. Newhall*, 888 N.W.2d 422, 425 (Iowa 2016), as amended (Mar. 7, 2017). "We view the record in the light most favorable to the nonmoving party" and "draw all legitimate inferences the evidence bears that will establish a genuine issue of material fact." *Andersen*, 913 N.W.2d at 535 (citations omitted). "A fact is material when its determination might affect the outcome of a suit. A genuine issue of

material fact exists when reasonable minds can differ as to how a factual question should be resolved." *Id.* "The moving party has the burden of showing the nonexistence of a material fact." *Nelson*, 867 N.W.2d at 6. "Speculation is not sufficient to generate a genuine issue of fact." *Id.* at 7.

## III.    Analysis

"To establish a prima facie case of medical malpractice, the plaintiff must demonstrate the applicable standard of care, the violation of this standard of care, and a causal relationship between the violation and the harm allegedly suffered by the plaintiff." *Phillips v. Covenant Clinic*, 625 N.W.2d 714, 718 (Iowa 2001). "Expert testimony is nearly always required to establish each of these elements." *Id.* "[P]roximate cause . . . cannot be based upon mere speculation," nor can any "consequential fact . . . be resolved by pure guesswork." *Id.*

In its ruling on the record on the renewed motion for summary judgment, the court reasoned:

> THE COURT: [Plaintiff] has made two claims against the Defendant in this case, what we would call the usual or ordinary, if there is such a thing, medical malpractice claim, and, secondly, lost chance of survival, both of which require [Plaintiff] to prove that the fault or negligence of the Defendant was a proximate cause of any resulting damages that are appropriate under each claim.
>
> I issued a ruling limiting the testimony of Nurse Quinn, and I think it's pretty much acknowledged that she's not a causation witness in this case. That leaves [Plaintiff] with the deposition testimony of the four doctors I previously mentioned, and which I'm assuming those four depositions are previously part of the record.
>
> . . . .
>
> It appears to me that—and I guess we've, I think, made statements maybe on or off the record—I'm not sure—by the attorneys that the medical testimony on causation isn't going to get any better. There's no new information that's going to be presented; is that a correct statement?
>
> [PLAINTIFF'S COUNSEL]: Yes, Your Honor.

THE COURT: All right. Specifically, then, I've looked at Dr. Milhem's deposition, M-I-L-H-E-M. And . . . he's asked, Would you—by [PLAINTIFF'S COUNSEL], Would you agree that—with the statement that with the type of cancer that Christina Waddell had the sooner the treatment began the better? Yes, was his answer.

And the follow-up question, And that's the, you know, the best chance of stopping the cancer before it spreads in lay terms? And the answer again was, Yes.

Dr. Stone's deposition, . . . when asked to summarize the course of treatment that Ms. Waddell had, her answer was, I believe I only saw her on one occasion. And I was going to look at the exact date, but she presented to me in consultation. It was—so 12/29/09. She presented to me with a three-year history of progressive change of her left fourth finger.

On page 14 an answer to a question at line 12, Three years is a significant time span in growth of a tumor.

Question, Is it fair to say you would agree that kind of sooner the better as far as getting in for a biopsy? And she said, Absolutely.

From my review of the depositions, and I believe from the record we've previously made, that is the testimony that Plaintiff is relying on to prove causation.

As everyone here knows, the purpose of summary judgment is to enable the moving party to obtain a judgment promptly without the expense of a trial when no genuine issue of material fact exists. In looking at this issue and question, every legitimate inference that can reasonably be deduced from the evidence should be afforded to the non moving party and/or in this case the Plaintiff.

Concerning expert testimony on causation, the rule in Iowa is that expert testimony indicating probability of a causal connection between the negligence and/or fault is—and result in damages is—is sufficient to generate a jury question on causation.

I'm finding on the record made, and specifically on Plaintiff's basically offered testimony on the issue of causation that we just read into the record for Drs. Milhem and Stone, that those general statements by the doctors do not generate genuine issue of material fact on proximate cause under the probability standard.

I would also note that, occasionally, Plaintiff can—can meet its burden on causation with possibility and a showing that the described condition did not exist before. And I think that's—that chance for Plaintiff to avoid this dismissal is—is voided by the testimony and the medical record that she had this condition for approximately three years before December of 2009, which means she had it for almost two and a half years—or not quite two and a half years. She was aware of it for almost two and a half years before going to the first visit at one of the Defendant's facilities.

In their deposition testimony, the three doctors designated as experts, Drs. Hoshi, Milhem, and Stone, did not make any conclusions on the duty of care or on any breach of that duty by the clinic personnel. There is no reference in any of their deposition testimonies to the earlier clinic visits at all. They provided no testimony to establish a causal relationship between any alleged breaches by the clinic and Christina's illness, progression, or death. Instead, each doctor testified to the actions and decisions they made in the course of treating Christina.

Notwithstanding, the plaintiff argues violations of the standard of care resulted in a delay in Christina's treatment, and each delay resulted in the likelihood that her cancer would spread and ultimately result in her death. He also argues that no additional or new testimony and evidence was presented to the court, so nothing has changed since the 2013 denial of summary judgment, and the ruling was therefore in error.

The plaintiff focuses his claims on the statements made by two of the doctors, Drs. Milhem[4] and Stone,[5] who both testified that the earlier Christina began treatment, the better. However, we agree with the trial court's assessment that the statements were too generalized to create a genuine issue of material fact regarding causation. Their statements offer no specific relation to the clinic visits and it would be speculative to infer their general statements relate to the clinic. Both Drs. Milhem and Stone testified that melanoma is unpredictable and there

---

[4] Dr. Milhem testified he agreed with the statements that "with the type of cancer that Christina Waddell had, the sooner the treatment began, the better" and "that's the best chance of stopping the cancer before it spreads."

[5] Dr. Stone testified she agreed with plaintiff's counsel's statement, "kind of sooner the better, as far as you getting in for a biopsy."

are no methods of determining a tumor's growth or progression at any specific point in time prior to being seen or biopsied. Significantly, neither doctor testified that had Christina been diagnosed or seen by UI after her clinic appointments in June, July, or August 2009, her chances of survival would have increased. They offered no probability on a connection between the clinics' actions or inaction and Christina's chance of survival. The only testimony the doctors offered about standards of care and chances of reoccurrences and survival focused on Christina's care after she was at UI, not before.

Plaintiff's assertion is that the court erred in changing its ruling because the law and facts did not change from the time of the 2013 denial of the motion for summary judgment until the time the court granted the renewed motion in 2017. However, the district court's denial of the 2013 motion for summary judgment was not a final judgment on the merits. *See Iowa Elec. Light & Power Co. v. Lagle*, 430 N.W.2d 393, 395–96 (Iowa 1988) (concluding a grant of a partial summary judgment was not a final judgment or order). "A district court judge may review and change a prior interlocutory ruling . . . in the same case." *McCormick v. Meyer*, 582 N.W.2d 141, 144 (Iowa 1998).

The plaintiff has only the treating doctors' testimony to establish causation, which the plaintiff conceded during the summary judgment hearing. While, for purposes of summary judgment, the facts of the case must be considered in a light most favorable to the plaintiff and all inferences must be drawn in the plaintiff's favor, we agree with the district court that the deposition testimony of the plaintiff's three experts does not produce sufficient evidence of causation between the

defendant's alleged actions or inactions and Christina's illness and ultimate death. Therefore, the plaintiff cannot establish a prima facie case of medical malpractice.

Plaintiff also makes a claim under the last-chance-of-survival or loss-of-chance doctrine. "A claim for loss of chance is not based solely on the ultimate harm, but on evidence that the patient had a chance of avoiding the ultimate harm." *Mead v. Adrian*, 670 N.W.2d 174, 187 (Iowa 2003) (Cady, J., concurring). "The injury is the lost opportunity of a better result, not the harm caused by the presenting problem." *Alberts v. Schultz*, 975 P.2d 1279, 1284–85 (N.M. 1999). To succeed on this claim, a plaintiff must "demonstrate, to a reasonable degree of medical probability, a causal link between the doctor's negligence and the loss of that chance." *Id.* at 1286. Causation does not need to be proven to "an absolute certainty." *Id.* "[T]he last-chance-of-survival doctrine is not an alteration of the traditional rules for determining proximate cause, but, rather, the creation of a newly recognized compensable event to which those traditional rules apply." *Mead*, 670 N.W.2d at 178.

This claim also suffers from insufficient evidence of causation. As with the traditional claim of negligence, the plaintiff must rely on the testimony of the three treating physicians designated as experts in order to provide evidence of causation. And like the other claim, there is an insufficient showing of a causal relationship between the actions or inactions of the clinics' medical personnel and any loss of chance. None of the doctors testified to any loss of chance, let alone provided any connection between any action or inaction by the defendant and Christina's chance of survival.

We find the trial court was thorough in its reasoning for granting the motion and did not err in granting summary judgment.  We therefore affirm the decision.

**AFFIRMED.**